UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PATRICIA BRITO, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF RUSSELL THEODORE BROWN,

    Plaintiff,

v.                               Case No: 8:20-cv-575-CEH-SPF

WINTER HAVEN HOSPITAL, INC.,

    Defendant.
_____/

## ORDER

This matter comes before the Court upon Defendant Winter Haven Hospital, Inc.'s Motion to Dismiss Counts III, VI, and VII of Plaintiff's Complaint [Doc. 22], Plaintiff's Response [Doc. 24], and Defendant's Reply [Doc. 31]. In its motion, Defendant argues that these counts do not raise claims that are plausible on their face. Plaintiff concedes as to Counts VI and VII, but opposes the motion as to Count III. The Court, having considered the motion and being fully advised in the premises, will grant-in-part Defendant Winter Haven Hospital, Inc.'s Motion to Dismiss Counts III, VI, and VII of Plaintiff's Complaint.

## I.  BACKGROUND[1]

Russell T. Brown, an African American male, was a licensed physician and general surgeon in the State of Florida. He maintained a practice of that profession in Winter Haven, Florida.[2] [Doc. 1 ¶¶ 5, 61]. He became employed by BayCare Medical Group, Inc., a not-for-profit Florida corporation, in August of 2017. In connection with his employment with BayCare Medical Group, Inc., Brown was required to obtain and maintain medical staff privileges at Defendant Winter Haven Hospital,[3] which was under the same ownership as BayCare. *Id.* ¶¶ 8, 9. The Medical Staff Bylaws of the Hospital govern the process through which physicians obtain clinical privileges at the Hospital and provide that physicians holding clinical privileges at the Hospital become members of the Medical Staff by virtue of receiving those clinical privileges and receiving the right to render medical care in the Hospital, regardless of any employment affiliation that physician may have or may not have with the Hospital. *Id.* ¶ 10. It also created the Medical Executive Committee ("MEC"), a body which is empowered to act on behalf of the Medical Staff as set forth in the Medical Staff Bylaws. *Id.* ¶ 11.

---

[1] The following statement of facts is derived from the Complaint [Doc. 1], the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983).
[2] Russel T. Brown passed away during the pendency of this action and his Estate is represented by Patricia Brito, as Personal Representative. [Doc. 39]. He will be referred to as Brown or Decedent.
[3] Defendant Winter Haven Hospital will be referred to as the Hospital or Defendant.

As a member of the Medical Staff of Winter Haven Hospital, Brown and Winter Haven Hospital, Inc., were bound by the Medical Staff Bylaws, which constitute an enforceable written contract between the members of the Medical Staff and the Hospital. *Id.* ¶ 12. On or about September 4, 2018, Brown was summoned to a meeting with Dr. Vincent Gatto, the Chief Medical Officer of the Hospital. *Id.* ¶ 14. He was given no advance notice of the purpose of the meeting and during that meeting Brown was asked to discuss two medical cases from memory—without the benefit of providing any medical records for reference—one of which was from treatment provided in May 2018, four months prior. *Id.* He was also asked to write a summary of his treatment of those two patients to present to the Medical Staff Quality Improvement Committee ("MSQIC") and he prepared a brief written synopsis of his treatment of those patients. *Id.* ¶ 15.

In December 2018, Brown was directed by Dr. Aleixo Viegas to appear before the MSQIC for what he was told was an "educational inquiry." *Id.* ¶ 16. When he attended the meeting, however, he was once again asked to review and defend his handling of the two surgical cases that had been the subject of the September 2018 meeting, again without advance notice of the true purpose for the meeting or any of the medical records at issue for reference. *Id.* ¶ 16. On January 14, 2019, Brown was advised by the MSQIC that he would have to undergo an intensive six month one-hundred percent focused review of his surgical cases based on the care provided to two specified patients, Patient A and Patient B. *Id.* ¶ 17. He was not provided with any further explanation regarding this "focused review". *Id.*

On February 15, 2019, Brown was hand-delivered a letter, dated the previous day, which notified him that "as a result of the focused review", three (3) additional cases were referred to the MSQIC—Patient B[4], Patient C, and Patient D. *Id.* ¶ 18. He was not asked to attend the MSQIC meeting for these cases or to provide any explanation to the MSQIC regarding these cases. *Id.* The letter requested Brown's "mandatory presence" at the next Medical Executive Committee Peer Review meeting on Tuesday, February 19, 2019 "to help [the MEC] better understand the care [Brown] provided." *Id.* ¶ 19. However, it did not identify any specific alleged deficiencies with Brown's medical care provided to the patients identified. *Id.* ¶ 20.

Brown attended the February 19, 2019 meeting during which he was asked about two additional surgical cases that he had not been notified would be discussed during that meeting, Patient E and Patient F. *Id.* ¶ 21. The following day, he received a letter from Dr. Chandrasekhar, President of the Medical Staff for the Hospital, which notified him that he was placed under a Precautionary Suspension for thirty days and that the MEC had voted to obtain external Peer Review concerning "multiple cases since [he] was placed on 100% focused review." *Id.* ¶ 22. However, the letter did not indicate that the MEC reached any conclusions related to the quality of care provided to patients by Brown. *Id.* The Precautionary Suspension was purportedly imposed pursuant to the Medical Staff Procedure: Progressive Discipline for Medical Staff, which states that a "temporary suspension of privileges" may be imposed on the

---

[4] The letter identified a separate admission for Patient B. [Doc. 1 ¶ 18 n. 1].

4

recommendation of the MEC to the Board of Trustees, per Medical Staff Bylaws, and is only authorized "whenever immediate action must be taken in the event of immediate threat of harm to patients in the hospital." *Id.* ¶¶ 23, 24. The letter did not state that Dr. Chandrasekhar had determined that immediate action had to be taken due to the immediate threat of harm to patients in the hospital. *Id.* ¶ 25.

The suspension of Brown's privileges triggered certain rights—pursuant to Article II, Section 5 of the Medical Staff Bylaws—including a right to request a formal hearing within thirty days following receipt of the adverse action notice. *Id.* ¶ 26. The Bylaws also required written notice of these rights, but the February 20, 2019 letter failed to notify Brown of these rights. *Id.* Additionally, the policy/procedure cited in support of the Precautionary Suspension violated the terms of Article II, Section 8 of the Medical Staff Bylaws, which states that the privileges can only be suspended "for up to two weeks or until reviewed by the Impaired Practitioner Committee." *Id.* ¶ 27. As such, the maximum amount of time that the President of the Medical Staff would have been authorized to suspend Brown's privileges under the Bylaws, had he reached a conclusion that immediate action had to be taken due to the immediate threat of harm to patients in the hospital, was two weeks. *Id.* ¶ 28. In fact, any further action relating to suspension of Brown's privileges beyond that two-week period would have had to be the result of action by the MEC, which did not meet during that time period and did not conduct any review to determine whether further review or investigation was warranted. *Id.* ¶ 29.

On March 19, 2019, nearly thirty days after the Precautionary Suspension was imposed, the MEC held a meeting. *Id.* ¶ 30. Brown did not attend this meeting, nor was he invited to attend. *Id.* When he inquired regarding the outcome of the meeting and the status of his Precautionary Suspension, he was told that he could not learn the outcome of the meeting until the next Board of Trustees meeting was held, which would not take place until March 26, 2019. *Id.* ¶ 31.

The MEC determined it would extend his Precautionary Suspension until March 26, 2019, but he was not notified at that time. *Id.* ¶ 32. Brown was not formally notified in writing as to the MEC recommendations, the reasons for the recommendations, the reason for the extension of the Precautionary Suspension, or any rights under the Bylaws to challenge these actions. *Id.* Brown was later notified of the extension of the Precautionary Suspension by a voicemail message. *Id.* The extension of the Precautionary Suspension until March 26, 2019 made the Precautionary Suspension effective for a total of thirty-five days, far in excess of the two-week limit contained in the Medical Staff Bylaws, and also triggered a reporting requirement for the Hospital to report the precautionary suspension to the National Practitioner Data Bank.[5] *Id.* ¶¶ 33, 34, 39. The existence of an Adverse Action Report

---

[5] The National Practitioner Data Bank ("NPDB") is a web-based repository of reports containing information on medical malpractice payments and certain adverse actions related to health care practitioners. *Id.* ¶ 35. It defines itself as a "workforce tool that prevents practitioners from moving state to state without disclosure or discovery of previous damaging performance" and requires the Hospital to report adverse actions taken against a practitioner by filing an Adverse Action Report when certain defined parameters have been met, including the imposition of a suspension of the practitioner's clinical privileges for a period of more than thirty (30) days. *Id.*

in the NPDB for a physician can act as an extremely high hurdle or complete barrier for that physician to obtain medical staff privileges at any new Hospital or surgery center, or employment, or credentialing as a third-party payor provider. *Id.* ¶ 37. Therefore, the imposition of a Precautionary Suspension lasting for more than thirty (30) days that leads to the filing of an Adverse Action Report often acts as the death knell of a surgeon's career as he or she would no longer be able to obtain the necessary medical staff privileges and credentials needed to perform surgeries at a hospital or surgery center. *Id.*

     The Medical Staff President, the MEC, and the Hospital failed to ever advise Brown, in writing or otherwise, regarding his rights under the Bylaws, or otherwise, related to his suspension. *Id.* ¶ 38. On March 21, 2019, prior to receiving any oral notice of the extension of his Precautionary Suspension through March 26, 2019, and on the 30th day of that suspension, Brown sent an "Appeal Letter" to the President of the Hospital. *Id.* ¶ 40. The Appeal Letter advised the Hospital that the MEC had not followed the Bylaws with respect to the imposition of the Precautionary Suspension and, therefore, the suspension was unlawful. *Id.* ¶ 41. The Appeal Letter specifically demanded that the Hospital refrain from filing an Adverse Action Report with the NPDB related to the illegal Precautionary Suspension, asserted Brown's rights to a hearing under the Bylaws, and requested information he was entitled to receive regarding any alleged peer review that had occurred, including certified copies of the medical records for the patients who were included in the review leading to the action

being taken against him. *Id.* ¶¶ 42, 43. A "Second Appeal Letter" was sent to the President of the Hospital on March 29, 2019. *Id.* ¶ 44.

On April 9, 2019, fourteen days after the Board of Trustees was scheduled to meet, Brown received a letter dated April 1, 2019 and signed by the Chairman of the Board of Trustees of the Hospital, notifying him "of the decision to revoke" his Medical Staff privileges at the Hospital. *Id.* ¶ 45. The Revocation Letter stated that the March 19, 2019 meeting was considered a "Peer Review session of the Winter Haven Hospital Medical Staff Executive Committee" and that a recommendation was made at that meeting to the Board of Trustees to revoke his privileges. *Id.* ¶ 46. The Board of Trustees met on March 26, 2019 and accepted and ratified that recommendation. *Id.* Both of those meetings were held with no notice to Brown, and without his knowledge. *Id.*

The Revocation Letter referenced seven cases and contained seven numbered "reasons" for the recommendation to revoke Brown's privileges, each of which allegedly related to "Concerns about clinical judgment, technical skill, and documentation." *Id.* ¶ 47. Brown had only been asked to discuss the outcome of five of the seven cases cited and two of the cases were never addressed with him in the MEC meeting. *Id.* In addition, Brown had never been afforded the opportunity to specifically address those cases before the information related to those cases was disseminated to the Board of Trustees and was not provided with due process of law with respect to any of these actions. *Id.* He was notified that he could appeal the recommendation to revoke his privileges. The Revocation Letter also advised him of

his "right to appeal this adverse recommendation to an independent panel designated by the Board" and of the deadline of thirty days within which to submit a written request for a hearing. *Id.* ¶ 49.

On April 21, 2019, before the thirty-day period for submitting a written request for a hearing expired, and before the Board of Trustees' recommendation to revoke Brown's clinical privileges became "final", the Hospital filed an Adverse Action Report against him. *Id.* ¶ 51. The Adverse Action Report reported the revocation of Brown's clinical privileges despite the fact that his privileges had not been revoked at that time as the revocation was not yet final. *Id.* ¶ 52. The Report further stated that "Physician was notified of this revocation on April 2, 2019," which was false and misleading. *Id.*

On April 9, 2019, the same day that Brown received the Revocation Letter, he also received a letter dated April 5, 2019 from BayCare, stating that his employment was being terminated "for cause" due to the fact his privileges were restricted, suspended, and/or revoked by the Hospital. *Id.* ¶ 53. The letter cited a 30-day cure period during which the privileges had to be reinstated to prevent the termination from taking effect on May 11, 2019. *Id.* On April 22, 2019, Brown sent a "Third Appeal Letter" to the President of the Hospital, confirming the fact that he had not received any copies of the requested information contained in his initial Appeal Letter, and requesting a hearing pursuant to Article 2, Section 5, Paragraphs C and D of the Medical Staff Bylaws, with respect to the Board of Trustees' decision to revoke his Medical Staff Privileges. *Id.* ¶ 54.

On April 26, 2019, Brown's counsel spoke to counsel for the Hospital, who agreed to suspend the peer review process while the parties attempted to reach a resolution, during which all deadlines would be extended, and the peer review process would not be resumed until the parties determined they were unable to reach an agreement. *Id.* ¶ 55. Brown's counsel confirmed these agreements in writing in a letter dated April 29, 2019. *Id.* He sent follow-up correspondence to the Hospital in September of 2019 and October of 2019 requesting the status of the Hospital's position, but the Hospital did not acknowledge or respond to same. *Id.* ¶ 56. The Hospital failed to engage in good faith efforts with Brown and his counsel to resolve this matter, or to conduct peer review pursuant to the Medical Staff Bylaws, and/or as mandated by law and also failed to timely address the Precautionary Suspension or take action on the request for a hearing on the Board of Trustees' recommendation to revoke Brown's clinical privileges. *Id.* ¶¶ 58-59.

During his fourteen-year career of practicing medicine and surgery, Brown never had a single malpractice claim or lawsuit initiated against him. *Id.* ¶ 60. Brown had become aware of public and internal information regarding other non-African American physicians who had complaints issued, had injured patients, had poor patient outcomes, and/or had undergone peer review and malpractice proceedings for many incidents involving negligence, which led to death, dismemberment, and permanent disability, but who have been allowed to maintain their Medical Staff privileges. *Id.* ¶ 62. The conduct of the Hospital adverse to Brown was disproportionate to its conduct related to other physicians on the Medical Staff and

10

was based on the Hospital's intent to discriminate against Brown on the basis of his race and his age. *Id.* ¶¶ 63, 64. The discrimination was intended to, and did, interfere with Brown's contractual rights with his employer, BayCare Medical Group, Inc. *Id.* ¶ 65.

Brown filed this lawsuit against the Hospital on March 11, 2020, asserting claims for injunctive relief (Count I), breach of contract (Count II), fraud (Count III), defamation (Count IV), race discrimination in violation of 42 U.S.C. §1981, Chapter 760, Florida Statutes, and Title VII of the Civil Rights Act of 1964 (Counts V, VIII, and IX), and age discrimination in violation of 29 U.S.C. § 621 et. seq. and Chapter 760, Florida Statutes (Counts VI and VII).

Defendant has moved to dismiss Counts III, VI, and VII, the claims for fraud and age discrimination. [Doc. 22]. First, it argues that neither the Age Discrimination in Employment Act ("ADEA") and Florida Civil Rights Act ("FCRA") recognize the claim asserted by Decedent, that he was discriminated against and treated differently on account of his age, 47, as he was younger and less experienced as a medical doctor than the doctors in the Winter Haven medical community. *Id.* at pp. 3-4. Defendant further argues that the Complaint is devoid of factual assertions beyond mere conclusory allegations to support Decedent's claim, as there is no allegation that any physician who participated in the review of his performance or the ultimate decision harbored any bias against him beyond his age and fails to identify any discriminatory comments made by any physician and any similarly-situated comparator that was treated more favorably. *Id.* at p. 4. As to the fraud claim, Defendant argues that the

11

Complaint fails to identify any false statement made to Decedent by Defendant, much less describe Decedent's detrimental reliance on such a statement. And therefore Brown has not met the burden under Rule 8 to assert claims that have more than just a sheer possibility of existing, nor under Rule 9 to allege fraud with particularity. *Id.* at pp. 4-5.

The response consents to the dismissal of Counts VI and VII of the Complaint,[6] but asserts that the Complaint pleads fraud with the requisite specificity. [Doc. 24 at pp. 1, 2, 4]. It further asserts that the purported peer review process that Brown was subjected to was a sham and fraudulent in nature and that the Hospital's motivation in connection with the peer review had nothing to do with the quality of care Decedent rendered to patients at the Hospital, but stemmed at least in part from bias and discrimination against him based on his race. *Id.* at pp. 2-3.

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). However, legal conclusions "are not entitled to the assumption of truth" and "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *McArdle v. City of Ocala*, 418 F. Supp. 3d 1004, 1006 (M.D. Fla. 2019) (first quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009), then quoting *Davila v. Delta Air Lines, Inc.*,

---

[6] As such, the Court need not address these claims in its discussion.

326 F.3d 1183, 1185 (11th Cir. 2003)). Additionally, Federal Rule of Civil Procedure 9(b) places more stringent pleading requirements on claims alleging fraud. Fed. R. Civ. P. 9(b). "[U]nder Rule 9(b) allegations of fraud must include facts as to time, place, and substance of the defendant's alleged fraud." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (citation and internal quotations omitted). A Plaintiff is thereby required to set forth "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks omitted) (citing *Clausen*, 290 F.3d at 1310). Failure to satisfy the particularity requirement under Rule 9(b) amounts to failure to state a claim under Rule 12(b)(6). *See, e.g., Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

When considering a motion to dismiss, the court ordinarily will not look beyond the four corners of the complaint. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). "[T]he . . . court may [also] consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Hum. Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). This standard is satisfied when the plaintiff pleads enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). By contrast, dismissal is appropriate when "no construction of the factual allegations will support the cause of action." *Glover v. Liggett Group,*

13

*Inc.*, 459 F.3d 1305, 1308 (11th Cir. 2006) (quoting *Marshall Cty. Bd. Of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).[7]

## III. DISCUSSION

Defendant seeks dismissal of the claim for fraud on the basis that the Complaint fails to plead the essential elements of that claim and with the requisite particularity. "The elements of a fraud claim include (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Bailey v. Covington*, 317 So. 3d 1223, 1227–28 (Fla. 3d DCA 2021) (citing *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. 3d DCA 2002)). "It is axiomatic that the facts and circumstances constituting an alleged fraud must be pled with specificity and particularity, even in ordinary civil actions to recover damages." *Daugharty v. Daugharty*, 456 So. 2d 1271, 1274 (Fla. 1st DCA 1984); *Blue Supply Corp. v. Novos Electro Mech., Inc.*, 990 So. 2d 1157, 1159 (Fla. 3d DCA 2008) (stating same and collecting cases). "Particularity means that a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (quotations omitted). Due process

---

[7] Generally, a court "must give a plaintiff at least one opportunity to amend the complaint before dismissing the action with prejudice." *Smith v. City of Fort Pierce*, No. 2:18-CV-14147, 2018 WL 5787269, at *5 (S.D. Fla. Nov. 5, 2018).

14

requires that the defendant know what he is accused of having misrepresented. *Schopler v. Smilovits*, 689 So. 2d 1189, 1189–90 (Fla.4th DCA 1997); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) ("The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'").

The Court agrees with Defendant that the Complaint does not sufficiently plead a claim for fraud. The Complaint alleges that "[Decedent] was subjected to a purported peer review process by the Defendant, which was a sham and fraudulent in nature." [Doc. 1 ¶ 17]. It then explains why the peer review process was sham and a fraud. However, the Court cannot extrapolate the elements for fraud from the allegations in the Complaint. For example, the Complaint does not identify any false statement concerning a specific material fact that was made to Decedent as it relates to the peer review process. In the same vein, there is no allegation as to when the false representation was made or by whom, which is required to satisfy the heightened standard of Rule 9. Additionally, there is no allegation that Decedent relied on the purported false representation and in what way. These deficiencies, the failure to plead all the requisite elements and with particularity, warrant dismissal of this count.

Further, the Court questions whether a claim for fraud can be grounded on the facts alleged in the Complaint. As Defendant argues, the allegations amount to little more than an expectation that Defendant would follow certain rules governing its

internal review process and a failure to abide by these rules. That, by itself, cannot establish a claim for fraud.

**According, it is hereby ORDERED**:

1. Defendant Winter Haven Hospital, Inc.'s Motion to Dismiss Count III, VI, and VII of Plaintiff's Complaint [Doc. 22] is granted-in-part. Count III of the Complaint is dismissed, without prejudice. Counts VI and VII are dismissed, with prejudice.

2. Plaintiff is granted leave to file an Amended Complaint, which cures the deficiencies as to the claim for fraud, on or before January 26, 2022.

**DONE AND ORDERED** in Tampa, Florida on January 12, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any